**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARSH USA LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>ALLIANT INSURANCE SERVICES, INC.,<br>GLENN PELLETIERE and COLIN HORGAN,<br><br>                    Defendants. | Case No.:<br><br><br>**COMPLAINT** |

Plaintiff Marsh USA LLC (f/k/a Marsh USA Inc.) ("Marsh" or "Plaintiff"), by and through its attorneys, Epstein Becker & Green P.C., as and for its Complaint against Defendants Alliant Insurance Services, Inc. ("Alliant"), Glenn Pelletiere ("Pelletiere") and Colin Horgan ("Horgan," and together with Alliant and Pelletiere, "Defendants"), hereby alleges as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This case is yet another chapter in Alliant's execution of its corporate strategy of theft. Alliant does not build—it raids. And once again, it has raided a Marsh McLennan entity for a high-performing team, led by a key producer managing a substantial book of business, in deliberate violation of binding contractual restrictions and settled law. Alliant's formula is by now well-known: identify a top producer with valuable client relationships; dangle an outsized compensation package tied directly to how much business he can steal; then orchestrate a wholesale lift-out of the producer's team and book—legal obligations be damned.

2.      This time, Alliant decided it wanted a Commercial Surety Practice. Rather than build one organically, it targeted the leading competitor in the space: Marsh. And Glenn Pelletiere—Marsh's Northeast Zone Surety Leader—was the perfect producer to target. Pelletiere,

had spent nearly a decade at Marsh, leveraging its brand and resources to cultivate a robust Commercial Surety book of business, anchored by four marquee clients—accounts he had won for Marsh and served as the face of the relationship for years. He was deeply embedded in the relationships—in a way that made him uniquely positioned to disrupt them.

3.      Pelletiere also led a skilled and trusted team: Colin Horgan, his second-in-command, with full visibility into confidential strategy and operations practice-wide; Madison Diaz, the primary day-to-day contact for several major accounts; and Nicholas Manning, a critical handler of key client relationships. Each one played a critical role in keeping Marsh's Surety clients close—and each was bound by one-year post-employment restrictions prohibiting the solicitation or servicing of Marsh clients and the solicitation of Marsh employees.

4.      On January 24, 2025, Pelletiere abruptly resigned effective immediately. He assured Marsh's Surety leadership that he understood and would honor his contractual obligations to Marsh to refrain from taking any clients or employees. That assurance was false. Minutes later, Horgan notified Marsh that he too was resigning to join Pelletiere at Alliant.

5.      Then came the client solicitations. Within days, one of the marquee clients in Pelletiere's book of business informed Marsh that Horgan had already contacted it and urged the client to move its accounts to Alliant with Horgan and Pelletiere. The client made clear that it valued its long-standing relationships at Marsh—and would stay if Marsh could maintain stability.

6.      That was precisely what Alliant set out to sabotage. It waited for Marsh to reassign the accounts Horgan had serviced to Manning, and for Manning to assure clients of continuity as their new primary contact. Then, just as the dust began to settle and Marsh had stabilized the transition, Alliant sprang the trap it had laid weeks earlier.

7.      Unbeknownst to Marsh, Pelletiere had already solicited Manning before resigning—and secured his commitment to defect. Marsh reassigning clients to him was exactly what Alliant wanted: it made Manning the new face of stability just long enough for Alliant to create the appearance of further instability in the eyes of the clients.

8.      On February 10, 2025, Manning resigned effective immediately, to join Alliant. That same day, Diaz—who had been the primary support for two of the largest clients in Pelletiere's book and which Alliant was actively pursuing—did too. Though based in different cities, in different offices, their departures were timed to the day. Alliant had choreographed them for maximum effect.

9.      Alliant's timing was no coincidence. It engineered the exits to maximize disruption and give clients the false impression that Marsh could no longer field a consistent team. But Alliant was not merely waiting in the wings to exploit a stumble. Pelletiere was already pressing clients to move to Alliant—and it wasn't easy. These were long-tenured clients with deep relationships at Marsh. So Alliant and Pelletiere gave themselves an advantage: they manufactured the appearance of chaos to undermine client confidence in Marsh.

10.     Ultimately, the scheme worked. On March 28, 2025, one of the largest Commercial Surety clients in Pelletiere's book of business moved its account to Alliant. The client had been with Marsh for nearly a decade. Pelletiere had led the relationship throughout. Diaz had managed the day-to-day relationship, with Horgan and Manning playing major supporting roles.

11.     This was not simply a case of a client following a trusted advisor out the door. Pelletiere resigned on January 24. Diaz followed on February 10. The client did not move until March 28. Had the client independently chosen to follow Pelletiere, the decision would have come quickly. It did not. It took time—time in which Pelletiere and Alliant were working aggressively

behind the scenes to flip the account, using the disruption they had engineered to create a window of opportunity. And because Marsh had entrusted him with the relationship for years, Pelletiere was uniquely positioned—with the access and credibility—to make the ask: move the business to Alliant. It was textbook solicitation—executed in violation of Pelletiere's contractual obligations and marking the culmination of the scheme he and Alliant had devised from the outset.

12.     Though Alliant has tried to cover its tracks, not everyone has managed to stick to the script. Tom Rhatigan—a former Marsh broker, now at Alliant—let it slip to Marsh's then-head of Surety for the United States, Brian Hodges: Alliant planned to "take all the business" through Pelletiere's team. That was the goal—and Alliant had incentivized the team to execute, tying their compensation directly to how much business they could rip from Marsh. "If [Horgan] hits his earnouts," Rhatigan bragged, "he will make more than you!" The comment wasn't just flippant— it was telling. Horgan was nine years out of college, not even a producer with his own book of business. Yet Alliant was prepared to pay him more than one of Marsh's most senior leaders—so long as he delivered stolen business.

13.     This raid is no outlier. It is the *seventieth* lawsuit brought against Alliant for executing this exact strategy. Courts across the country have condemned its conduct and enjoined its tactics. In one case, the Delaware Chancery Court issued a permanent injunction against Alliant and castigated its regular outside counsel for conduct that, the court suggested, might "fall within the crime/fraud exception to the attorney-client privilege." *Mt. W. Series of Lockton Cos., LLC v. Alliant Ins. Servs.*, 2019 WL 2536104, at *17-22 & n.6 (Del. Ch. June 20, 2019). Alliant's response? It reincorporated in California and picked up right where it left off.

14.     Marsh brings this action to hold Alliant and its co-conspirators accountable. It seeks to enforce binding restrictive covenants, protect its confidential and trade secret information, and

put a stop to Alliant's campaign of unfair competition. Marsh does not fear fair competition. But it will not stand by while a rival cheats to steal what Marsh built.

## THE PARTIES

15.     Marsh is an insurance brokerage and risk management firm that provides an array of services for its clients, including insurance brokering, consulting, and claims advocacy services. Marsh is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business New York, New York. Marsh is an indirect subsidiary of Marsh & McLennan Companies, Inc. ("MMC"), a publicly held corporation traded on the New York Stock Exchange, which is incorporated in Delaware with its principal place of business in New York, New York.

16.     Pelletiere is an individual who, upon information and belief, is a citizen and resident of the State of New Jersey. Pelletiere is a former employee of Marsh and a current employee of Alliant.

17.     Horgan is an individual who, upon information and belief, is a citizen and resident of the State of New Jersey. Horgan is a former employee of Marsh and a current employee of Alliant.

18.     Alliant is a corporation organized and existing under California law, with its principal place of business in Newport Beach, California.[1] Alliant does business and maintains offices throughout the United States, including in New York, where it is registered to do business and maintains six offices (including two offices located in New York City). Like

---

[1] Until January 2020, Alliant was a Delaware corporation. But after a privilege waiver in a litigation against Alliant in Delaware laid bare the full depth of Alliant's unlawful conduct and resulted in a scathing rebuke by the Delaware Chancery Court (*see Lockton*, 2019 WL 2536104), Alliant fled the jurisdiction, dissolving its incorporation in Delaware and re-incorporating in California.

Marsh, Alliant is in the business of providing insurance brokerage and related services to its clients. Marsh and Alliant are direct competitors.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332 (diversity of citizenship) because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000, exclusive of interests and costs.

20.     This Court has personal jurisdiction over Alliant because Alliant conducts business in this District and has committed tortious acts within the State of New York or has directed its tortious conduct toward the State of New York. Alliant knowingly targeted and recruited Marsh employees who worked in Marsh's New York office, induced them to breach agreements that Alliant knew were governed by New York law and contained New York forum selection clauses, and caused harm to Marsh in New York. Alliant's conduct was intentionally directed at this forum, and the claims arise directly from that conduct.

21.     Alliant is also subject to personal jurisdiction in this Court under the closely related parties doctrine because Alliant intentionally interfered with contracts between Marsh and its New York-based employees, which Alliant knew contained mandatory forum selection clauses designating the courts in New York County or the Southern District of New York as the exclusive forum for resolution of disputes. Alliant's interference with those contracts is the precise conduct giving rise to this action. Because Alliant orchestrated, directed, and benefited from the breaches it induced of contracts it knew contained New York forum selection clauses, it was foreseeable that it would be bound by those forum selection clauses.

22.     Personal jurisdiction exists over Pelletiere and Horgan because in the agreements that they executed with Marsh, detailed below, each agreed to the jurisdiction of this Court in

connection with any action arising in connection with those agreements or with their employment with Marsh. Pelletiere's and Horgan's breaches of their obligations under those agreements and their breaches of the duty of loyalty during their employment with Marsh are the subject of this Complaint.

23.    This Court also has specific jurisdiction over Pelletiere and Horgan because they transacted business with Marsh—which maintains its principal place of business in New York, New York—and worked in Marsh's New York office, and Marsh's claims arise in whole or in part from those transactions.

24.    Venue is proper in this District pursuant to 28 USC §§ 1391(b)(2) and 1391(b)(3) because the Marsh agreements signed by Pelletiere and Horgan, which are the subject of the breach of contract claims set forth herein, contain a Governing Law and Choice of Forum provision, designating courts in New York County or the United States District Court for the Southern District of New York as the exclusive venue for resolution of disputes between the parties. Further, Marsh maintains its principal place of business in this judicial District.

## FACTUAL ALLEGATIONS

### A.    Marsh's Business

25.    Marsh is a leading insurance brokerage and risk management firm. Among its many specialties, Marsh has built a nationally recognized Surety practice.

26.    Surety is a credit instrument, also known as a bond guarantee. A surety company guarantees that a business corporation, called a principal, will fulfill its obligations to a third party, called an obligee. If the principal fails to do so, the obligee can seek recovery from the surety company. Marsh is not a surety company but provides surety-related services, including executing bonds, reviewing contracts, and obtaining bonding capacity from surety companies.

27.    Marsh's Surety practice is comprised of three specialties: Construction Surety, Commercial Surety, and International Surety. Marsh has developed this practice over decades through sustained investment in talent, infrastructure, and client service. Today, Marsh is a market leader in the Surety space, with deep expertise and long-standing relationships with clients across a wide range of industries.

### B.  Pelletiere's and Horgan's Employment at Marsh

28.    For nearly a decade, Pelletiere served as Marsh's Northeast Surety Zone Leader—the most senior Surety position in the region. In that role, he oversaw all Surety operations across the Northeast, managed the region's financial performance, and had direct managerial responsibility for every Surety employee in the zone. Pelletiere's leadership role gave him access not only to information about his own book of business, but also to the Surety practice's broader commercial strategy, client development plans, compensation structures, regional revenue performance, and market positioning across the region. He played a key role in hiring and staffing decisions, budget planning, and strategic initiatives aimed at expanding Marsh's Surety presence in key markets.

29.    In addition to his managerial duties, Pelletiere managed a substantial book of business for Marsh, concentrated in commercial surety. He was the lead advisor to some of Marsh's largest and most sophisticated clients—including multiple Fortune 500 companies—on complex bonding needs. By leveraging Marsh's brand and resources over nearly a decade, he had developed long-standing relationships with key decisionmakers at those clients and with senior underwriters at major sureties. On behalf of Marsh, he directed strategic surety placements, negotiated bonding capacity, and delivered bespoke credit and risk-transfer solutions across a wide

range of industries. Through this dual role, Pelletiere occupied a uniquely sensitive position at the center of Marsh's Surety operations.

30.     Horgan was a senior member of Marsh's Surety Practice, where he reported directly to Pelletiere and acted as his right-hand support on Commercial Surety accounts. Horgan was the primary day-to-day contact for many of the firm's largest Commercial Surety clients—relationships that collectively generated several millions of dollars in annual revenue and were overseen by Pelletiere as producer. Over nearly ten years at Marsh, Horgan rose through the ranks, from Assistant Vice President – Client Advisory to Vice President – Client Advisory. Most recently, at the end of 2024, Marsh announced his promotion to Senior Vice President, effective April 1, 2025.

31.     In addition to his client-facing responsibilities, Horgan held operational authority over budgeting and forecasting for both the Surety and Construction practices within Marsh's Northeast Zone. This role gave him significant visibility into broader financial performance and regional strategy. From April 2024 through his resignation in January 2025, he also served as Interim Strategy and Operations Leader for Marsh's Global Construction Practice. In that capacity, Horgan oversaw cross-regional initiatives, analyzed global premium trends, and developed internal benchmarking tools—work that gave him access to confidential business plans, financial targets, and client-servicing strategies across Marsh's Surety and Construction platforms. Between his operational authority and frontline role managing key client relationships, Horgan developed a comprehensive understanding of Marsh's Surety business—insights he would later bring to Alliant.

32.     Nicholas Manning and Madison Diaz joined Marsh's Surety practice in 2023, where they supported Pelletiere in servicing his commercial surety clients. Manning held the title

of Client Advisor – Surety and worked closely with the team on a range of key accounts. Diaz held the title of Surety Fulfillment Specialist and served as the day-to-day contact for the largest commercial surety client in Pelletiere's portfolio. Both had direct access to confidential client communications, bonding records, and proprietary servicing protocols, and were integral to Marsh's delivery of high-touch surety services on several of its most important accounts.

33.    To perform their jobs advising clients, placing appropriate surety bonds, and generally servicing their accounts, Marsh entrusted Pelletiere and his team with highly confidential information, including, without limitation: the identity and contact details of key client representatives; clients' bonding needs and preferences, including risk tolerance, indemnity structures, collateral requirements, and premium sensitivities; complete details concerning clients' existing surety programs, including bond types, limits, expiration and renewal timelines, negotiated terms, rates, and collateral arrangements; clients' financial disclosures, loss history, and bonding track record; strategic information regarding prior bond negotiations and claims experience with sureties; each client's level of satisfaction or dissatisfaction with particular surety carriers; contact information for key personnel at surety companies; the specific underwriting appetites and requirements of various surety markets; Marsh's compensation structure for each client relationship; the revenue Marsh derived from those relationships; Marsh's internal assessments of client retention risks and vulnerabilities; and other proprietary insights necessary for delivering the sophisticated, customized service that defines Marsh's approach to commercial surety.

34.    This information is the product of years of investment by Marsh—gathered, distilled, and refined through substantial time, effort, and expense. This information has independent economic value. It is not available to the public or to competitors, and it would be

highly valuable to any firm attempting to solicit Marsh's clients or replicate its Surety service model.

35.    Accordingly, Marsh treats this information as strictly confidential and takes extensive measures to safeguard it. These include limiting access to employees with a specific business need to know; educating those employees on their confidentiality obligations; restricting access to relevant systems and databases; and requiring employees to sign written agreements prohibiting the misuse, improper disclosure, or post-employment retention of such information.

### C.  Pelletiere's and Horgan's Contractual Obligations to Marsh

### i.  The Marsh USA Inc. Non-Solicitation Agreement

36.    In connection with and as a condition of their employment, and in exchange for access to Marsh's confidential, proprietary and trade secret information, Pelletiere and Horgan each executed the Marsh USA Inc. Non-Solicitation Agreement (the "NSA"). (A true and correct copy of Pelletiere's NSA is attached hereto as **Exhibit A**; a true and correct copy of Horgan's NSA is attached hereto as **Exhibit B**.)

37.    Under the NSA, Pelletiere and Horgan each agreed to one-year post-employment restrictive covenants barring them from directly or indirectly soliciting Marsh clients or employees or servicing Marsh clients.

38.    Specifically, in Section 1 of the NSA, entitled "Non-Solicitation of Clients," Pelletiere and Horgan agreed that for one-year following their separation of employment from Marsh, they would not, "directly or indirectly":

> (i)    solicit clients or prospective clients of the Company for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by the Company;

11

      (ii)     induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company;

      (iii)    perform or supervise the provision or performance of services or provision of products of the type sold or provided by Employee while he or she was employed by the Company on behalf of any clients or prospective clients of the Company; or

      (iv)    assist others to do the acts specified in Sections 1(b) (i)-(iii).

Exs. A & B, § 1.

39.    This restriction applies to clients or prospective clients with whom Pelletiere or Horgan had "contact" or about whom they obtained confidential information or trade secrets during the last two years of their employment. "Contact" is defined, with respect to clients, as interactions undertaken to further the business relationship, including soliciting or servicing business or supervising such efforts. With respect to prospective clients, "contact" is defined as interactions to obtain their business. *Id.*

40.    The NSA further bars Pelletiere and Horgan from "engag[ing] in any subterfuge to circumvent [the client non-solicitation and non-servicing] prohibition[s]"—such as accompanying others on client calls, "supervising" others soliciting or servicing the client, sharing confidential information to aid others in soliciting or servicing the client, participating in pitch development, "or other similar activities." *Id.*

41.    The NSA imposes a similar one-year post-employment restriction on employee solicitation. Specifically, in Section 2 of the NSA, entitled "Non-Solicitation of Employees," Pelletiere and Horgan agreed that "both during employment with the Company and for a period of twelve (12) months thereafter," they would not—"directly or indirectly," and whether on their own behalf or on behalf of another—solicit or attempt to solicit any Marsh employee: (a) with whom

they had interacted in the last two years of their employment for the purpose of soliciting or servicing business, or (b) about whom they had obtained "Confidential Information and Trade Secrets." *Id.*, § 2.

42.     In Section 4, Pellietere and Horgan agreed that the restrictions in the NSA are "necessary to protect the legitimate business interests of [Marsh] and [are] reasonable in view of the benefits and consideration [he] has received or will receive from [Marsh]." They also expressly acknowledged that the restrictions would not prevent them "from obtaining gainful employment in [their] field of expertise or cause [them] undue hardship."

43.     Pelletiere and Horgan also agreed in Section 5 of the NSA that Marsh would be entitled to recover its attorneys' fees and other expenses and costs "incurred by [it] in seeking to enforce the provisions of th[e] [NSA]."

44.     In addition, the NSA provides for liquidated damages in the event of a breach of the non-solicitation covenants. *Id.*, § 6.

45.     In Section 6(a) of the NSA, Pelletiere and Horgan acknowledged that Marsh would be injured by any breach of their restrictive covenants, that the damages would be "difficult or impossible to ascertain," and that Marsh would therefore lack an adequate remedy at law. *Id.*, § 6(a).

46.     Pelletiere and Horgan further acknowledged that Marsh's client relationships are often "long term" and that losing a client could result in lost revenue for a "significant but indeterminate" period—extending beyond the one-year duration of his restrictive covenant obligations. *Id.*

47.     In addition, Pelletiere and Horgan acknowledged that "the loss of a client erodes the goodwill" Marsh enjoys, reduces referral opportunities, and diminishes Marsh's ability to

obtain or service additional business from that client—beyond the business Pelletiere and Horgan personally obtained or serviced from the client. *Id.*

48.    They also acknowledged that Marsh's client base is the result of its investment of time and money in hiring personnel, developing technological and business infrastructure, and providing other support that enabled him to build and maintain relationships with clients. They acknowledged that a breach of their obligations would reduce the value of Marsh's investments and force Marsh to incur out-of-pocket costs in ways that cannot be readily allocated or fully calculated. *Id.*

49.    Based on these consideration, Pelletiere and Horgan agreed that if they violate their restrictive covenant obligations set forth in Sections 1, 2, or 3 of the NSA, and a client either reduces or cancels its business with Marsh and redirects it to Pelletiere, Horgan or their new employer, Pelletiere or Horgan, as applicable, must pay Marsh liquidated damages equal to the total fees and commissions Marsh earned from that client during the two years before the breach. *Id.* at § 6(b).

50.    The liquidated damages provided for in the NSA are not exclusive of other remedies. Section 6(c) of the NSA expressly permits Marsh to seek equitable relief and/or to elect to prove actual damages instead of liquidated damages.

51.    Section 11 of the NSA provides that the NSA shall be governed by New York law, and that "any action or proceeding with respect to the [NSA] and Employee's employment shall be brought exclusively in the Civil Court of the City of New York, New York County, or in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York, or in any other court of competent jurisdiction in or for the State and County of New York." Pelletiere and Horgan consented to "personal jurisdiction" and

"irrevocably waive[d] any objection…to the laying of venue of any such action in the said court(s)" or that "any such action brought in said court(s) has been brought in an inconvenient forum."

ii. **Restrictive Covenant Agreement**

52.    On or about February 22, 2024, in exchange for a Long-Term Incentive award of restricted stock, which he received, Pelletiere executed and agreed to be bound by a Restrictive Covenants Agreement (the "RCA") with MMC and its affiliates (including his employer, Marsh). (A true and correct copy of the RCA is attached hereto as **Exhibit C**.)

53.    In the RCA, Pelletiere agreed to be bound by a one-year client non-solicitation provision, in addition to his similar obligation under the NSA:

> Restrictive Covenants: Clients
>
> …
>
> (a)    The Employee acknowledges and agrees that solely by reason of employment by the Company, the Employee has and will come into contact with and develop and maintain relationships with a significant number of the Company's clients and prospective clients and have access to Confidential Information (as defined below) and trade secrets relating thereto, including those regarding the Company's clients, prospective clients and related information, and will have access to and the benefit of goodwill developed by the Company with its clients. Consequently, the Employee covenants and agrees that in the event of separation from employment with the Company, whether such separation is voluntary or involuntary, the Employee will not, for a period of twelve (12) months following such separation, directly or through others:
>
> (i)    solicit clients of the Company for the purpose of selling or providing products or services of the type sold or provided by the Employee while employed by the Company; or
>
> (ii)    induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company; or
>
> (i)    perform or supervise the performance of services or provision of products of the type sold or provided by the Employee while he or she was employed by the Company on behalf of any clients or prospective clients of the Company; or

(ii)     assist others to do the acts specified in Paragraphs 2(b) (i)-(iii).

This restriction shall apply only to those clients or prospective clients of the Company with which the Employee had contact or about which the Employee obtained Confidential Information or trade secrets during the last two (2) years of his or her employment with the Company or its predecessors. For the purposes of Section 2, the term "contact" means interaction between the Employee and the client which takes place to further the business relationship or making (or assisting or supervising the making of) sales to or performing or providing (or assisting or supervising the performance or provision of) services or products for the client on behalf of the Company. For purposes of Section 2, the term "contact" with respect to a "prospective" client means interaction between the Employee and a potential client of the Company which takes place to obtain the business of the potential client on behalf of the Company. It shall not be a defense to a claim that this provision has been breached that Employee's new employer or entity for which Employee is performing services has previously solicited or served the client. Employee shall not engage in any subterfuge to circumvent this prohibition, including, but not limited to accompanying others on calls to the client, contacting the client with other persons, supervising other persons in soliciting or serving the client, providing Confidential Information to others to assist them in soliciting or serving the client, participating in developing presentations to be made to the client, or other similar activities.

*Id.*, § 2(a)–(b).

54.     In the RCA, Pelletiere also agreed to be bound by a one-year employee non-solicitation provision:

The Employee acknowledges and agrees that solely as a result of employment with the Company, and in light of the broad responsibilities of such employment which include working with other employees of the Company, the Employee has and will come into contact with and acquire Confidential Information and trade secrets regarding the Company's other employees. Accordingly, both during employment with the Company and for a period of twelve (12) months thereafter, the Employee shall not, either on the Employee's own account or on behalf of any person, company, corporation, or other entity, directly or through others, solicit, or endeavor to cause any employee of the Company with whom the Employee, during the last two (2) years of his or her employment with the Company, came into contact for the purpose of soliciting or servicing business or about whom the Employee obtained Confidential Information to leave employment with the Company.

*Id.*, § 3.

55.    Section 13 of the RCA provides that the RCA shall be governed by New York law, and that "any action or proceeding with respect to the [RCA] and Employee's employment shall be brought exclusively in the Civil Court of the City of New York, New York County, or in the Supreme Court of the State of New York, New York County, or in the United States District Court for the Southern District of New York, or in any other court of competent jurisdiction in or for the State and County of New York." Pelletiere consented to "personal jurisdiction" and "irrevocably waive[d] any objection…to the laying of venue of any such action in the said court(s)" or that "any such action brought in said court(s) has been brought in an inconvenient forum."

### D.    Alliant's Unlawful Growth Strategy and Playbook

56.    Alliant's foray into the Construction Surety business began with one of the most brazen and coordinated raids the insurance industry has ever seen—so notorious it was excoriated in an opinion by Justice Fried of the Supreme Court of New York. *See Aon Risk Servs. v. Cusack*, 946 N.Y.S.2d 65, 2011 WL 6955890 (N.Y. Sup. Ct. 2011). "Before January 1, 2011, Alliant had no virtually no construction surety business." *Id.* at *2. That changed overnight when Alliant executed a secret, premeditated campaign to poach a team of Construction Surety producers from a competitor—producers who controlled tens of millions of dollars in revenue and decades of client relationships. *Id.* at *5. The scheme was laid bare in internal Alliant memos projecting hundreds of millions of dollars in revenue, alongside nearly $25 million earmarked for legal fees and "Settlement Costs"—clear evidence that Alliant "knew it would be sued for its conduct." *Id.* at *5, 12 The court later found that Alliant's testimony denying solicitation and coordination was "simply not believable" or "credible," concluding that the firm's leadership intentionally concealed its misconduct and misappropriated confidential client information in the process. *Id.* at *5, 10-11. This scorched-earth strategy would become Alliant's playbook—a high-stakes model

Case 1:25-cv-05470-JPO    Document 1    Filed 07/01/25    Page 18 of 45

built not on growing talent, but on systematically raiding competitors, regardless of the legal or ethical lines it crossed.

57.     Since then, Alliant has grown its business by weaponizing competitors' employees to capture their employers' client relationships for Alliant's benefit. Alliant's growth strategy is to entice producers overseeing substantial books of business at its competitors to join Alliant on the condition that they bring along clients and teams from their former employer—in deliberate breach of their fiduciary and restrictive covenant obligations to their former employer. Alliant euphemistically refers to these targeted hires as "leveraged hires." [2]

58.     This tactic is not merely aggressive; it is knowingly unlawful, calculated on the assumption that the financial return on the pilfered client relationships will exceed any legal costs Alliant may incur. Alliant's President has made the calculus clear: when lawsuits arise, the company simply "strike[s] a deal with the competitor that involves buying the producer's book of business for less than full market value."[3] This way, Alliant secures long-term client relationships at a discount—keeping exactly what it values most, while skirting fair market principles (and the law) in the process.

59.     In the past decade, this inherently unlawful growth model has led to at least 70 lawsuits (including this one) against Alliant and/or the producers at competitors it has recruited to carry out its schemes. Through many litigations, Alliant's strategy has been increasingly exposed,

---

[2] *See Mt. W. Series of Lockton Cos., LLC v. Alliant Ins. Servs.*, No. 2019-0226-JTL, Exhibit 1 to Transmittal Affidavit and Corrected Transmittal Affidavit of Jarrett W. Horowitz in Support of Plaintiffs' Opening Brief in Support of Their Motion for a Preliminary Injunction (Del. Ch. July 21, 2022) (internal Alliant email referring to producers with existing books of business whom Alliant was recruiting from a competitor firm as "Leveraged Hires").

[3] Declaration of Ned Sander in Support of Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, *Armfield Harrison & Thomas, LLC and BRP Colleague Inc. v. Brian King and Alliant Ins. Servs., Inc.*, No. 23-cv-00666, ECF No. 25 at ¶ 19 (W.D. Wash. Sept. 14, 2023).

revealing a consistent, calculated methodology for raiding competitors, complete with procedures to "mask [Alliant's] activities under a façade of compliance measures" intended to deceive competitors and the courts and thereby minimize Alliant's legal risk. *Lockton*, 2019 WL 2536104, at \*22.[4]

60.    The litigations against Alliant for its unlawful raiding strategy include at least the following: *Leavitt Great West Ins. Servs., LLC v. Krysta Theriault and Alliant Ins. Servs., Inc.*, No. 25-cv-24 (D. Mont. Mar. 5, 2025); *Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc., Travis Davis, Keegan Richardson, Susan Cetzee, Raiza Robles, and Amanda Gunn*, No. 25-cv-01260 (S.D.N.Y. Feb. 12, 2025); *Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc., Johnny Osborne, Margaux Stone, and Rachel Murray*, No. 24-cv-00914 (S.D.N.Y. Dec. 23, 2024); *Willis Towers Watson Midwest, Inc. v. Miller and Alliant Ins. Servs., Inc.*, No. 24-cv-02539 (D. Kan. Nov. 21, 2024); *Willis Towers Watson Northeast, Inc. v. Scott Davis, Erin Schwamb, and Alliant Ins. Servs., Inc.*, No. 24-cv-01816 (D. Conn. Nov. 19, 2024); *Jones v. AssuredPartners NL, LLC*, No. 24-cv-398 (W.D. Ky. July 5, 2024) (including counterclaims *AssuredPartners Cap., Inc. v. Alliant Ins. Servs., Inc., Adamic, and Brewer*); *NFP Corp. Servs. (SE), Inc. v. Starkey*, No. 24-cv-00796 (D. Del. June 25, 2024); *NFP Prop. & Cas. Servs., Inc. v. Alliant Ins. Servs., Inc.*, No. 24-cv-00789 (C.D. Cal. Apr. 10, 2024); *The Tex. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, No. 2024-11651 (Tex. Dist. Ct. Feb 23, 2024); *USI Ins. Servs. LLC v. Louis Spina and Alliant Ins. Servs., Inc.*, No. 70777/2023 (N.Y. Sup. Ct. Nov. 14, 2023); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc.*, No. 23-cv-659 (E.D. Va. Oct. 12, 2023); *Lockton Cos., LLC Pac.*

---

[4] In 2022, in unsealing the internal Alliant documents that had been revealed in discovery in the *Lockton* litigation, the Delaware Chancery Court noted that "Alliant faces at least forty-one lawsuits in at least twenty-five jurisdictions in which competitors have asserted similar claims" related to Alliant's strategy, and documents revealed in that litigation "provide insight into Alliant's *modus operandi.*" *Mt. West Series of Lockton Companies, LLC v. Alliant Ins. Servs., Inc.*, C.A. No. 2019-0226-JTL, Order Denying in Part and Granting in Part Second Motion for Continued Confidential Treatment, ¶ 20(a) (Del. Ch. July 14, 2022).

*Series, and Lockton Partners, LLC v. Alliant Ins. Servs., Inc., Barnes, Racunas, and Roderick*, No. 23-cv-00705 (W.D. Mo. Oct. 3, 2023); *Assured Partners of S.C., LLC v. Alliant Ins. Servs., Inc., Lonneman, Shultz, Peterson, Bugeski, Rushe, and Harris*, No. 23-cv-04751 (D.S.C. Sept. 22, 2023); *Woodruff-Sawyer & Co. v. Pelissier, Alliant Ins. Servs., Inc., and Does 1-5*, No. 30-2023-01336213 (Cal. July 13, 2023); *Aon PLC v. Alliant Ins. Servs., Inc.*, 23-cv-03044 (N.D. Ill. May 15, 2023); *Armfield Harrison & Thomas, LLP and BRP Colleague, Inc. v. King and Alliant Ins. Servs., Inc.*, No. 23-cv-666 (W.D. Wash. May 8, 2023); *USI Ins. Servs. LLC v. Alliant Ins. Servs., Inc.*, No. 23-cv-00192 (D. Ariz. Jan. 30, 2023); *Lockton Cos., LLC - Pac. Series v. Giblin*, No. 22-CV-00791 (W.D. Mo. Nov. 30, 2022); *McGriff Ins. Servs., Inc.  v. Suplick, Fox, Cook, Gibson, and Alliant Ins. Servs., Inc.*, No. 2022-CA-008660-O (Fla. Cir. Ct. Sept. 19, 2022); *Arthur J. Gallagher & Co. v. Alliant Ins. Servs., Inc.*, 22-cv-03931 (N.D. Ill. July 28, 2022); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc., Thomas, Bennett, and Gullet*, No. 22-cv-277 (W.D.N.C. June 21, 2022); *McGriff Ins. Inc. v. Madigan, Gramling, Linde, and Alliant Ins. Servs., Inc.*, No. 22-cv-05080 (W.D. Ark. Apr. 26, 2022); *Aon PLC, Aon Group, Inc., Aon Corp., and Aon Risk Services Companies, Inc. v. Alliant Ins. Servs., Inc., Johnson, Stites, Barlow, Doerfler, Kunstler, and Chan*, No. 21-cv-06871 (N.D. Ill. Dec. 27, 2021); *Arthur J. Gallagher & Co. v. Alliant Ins. Servs., Inc., Bixby, Hinckley, Leavitt, Pester, and Rogers*, No. 2184CV2828 (Mass. Dec. 10, 2021); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc.*, 21-cv-00417 (W.D.N.C. Aug. 12, 2021); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc., Andrew Rader, and Nicole Rioux*, No. 202982-1 (Chan. Ct., Tenn., Aug. 3, 2021); *Aitkin v. USI Ins. Servs., LLC*, No 21-cv-00267 (D. Or. Feb. 18, 2021); *Kibble & Prentice Holding Co. v. Anderson, and Alliant Ins. Servs., Inc.*, No. 82-CV-21-619 (Minn. Dist. Ct. Feb. 19, 2021); *Kibble & Prentice Holding Co., v. Tilleman and Alliant Ins. Servs., Inc.*, No. 21-cv-00083 (D. Idaho Feb.

20

18, 2021); *AssuredPartners Northeast, LLC v. Stone and Alliant Ins. Servs., Inc.*, 20-cv-05564 (E.D.N.Y Nov. 16, 2020); *The Partners Grp., LTD v. Bonville and Alliant Ins. Servs., Inc.,* No. 20CV34115 (Or. Cir. Ct. Oct. 6, 2020); *Arthur J. Gallagher & Co. v. Alliant Ins. Servs., Inc. and Stone Point Capital*, No. 2020-0780 (Del. Ch. Sept. 14, 2020); *Arthur J. Gallagher & Co. v. Pierce, Albrecht, Conway, Lambourne, Ruemke, Veltman, Burke, Thalachelloor, and Alliant Ins. Servs., Inc.*, No. 47103886-2020 (Tex. Dist. Cit. Aug. 13, 2020); *Arthur J. Gallagher & Co. v. Tarantino, Heater, Machette, Brush, and Alliant Ins. Servs., Inc.*, No. 20-cv-05505 (N.D. Cal.) (Aug. 7, 2020); *Huntington Bancshares Inc. v. Burke and Alliant Ins. Servs., Inc.*, 20-cv-01159 (W.D. Pa. Aug. 3, 2020); *Gallagher Benefit Servs., Inc. v. Ghirardi and Alliant Ins. Servs., Inc.*, No. 50-2020-CA-004646-MB (Fl. Cir. Ct. Apr. 24, 2020); *Assured Partners of Washington, LLC v. Acarregui and Alliant Ins. Servs., Inc.*, No. 20-cv-00290 (W.D. Wash. Feb. 24, 2020); *Marsh USA Inc. v. Vaught, Snelgrove, Dowling, Shahidi, Lu, Turney, Nguyen, and Alliant Ins. Servs., Inc.*, No. 651024/2020 (N.Y. Sup. Ct. Feb. 14, 2020); *Aon Risk Servs. Co. v. Alliant Ins. Servs., Inc., Brusek, Janic Lubas, Ross, Taylor, Vick, and Walsh*, No. 19-cv-07312 (N.D. Ill. Nov. 5, 2019); *USI Ins. Servs. LLC and USI Advantage Corp. v. Banahan and Alliant Ins. Servs., Inc.*, No. 68183/2019 (N.Y. Sup. Ct. Nov. 1, 2019); *JLT Specialty Ins. Servs. Inc. v. Riccio, Walsh, Carroll, Decatur, Franzese, Leto, and Alliant Ins. Servs., Inc.*, No. 652659/2019 (N.Y. Sup. Ct. May 6, 2019); *Mt. W. Series of Lockton Cos., LLC and Lockton Partners, LLC v. Alliant Ins. Servs., Inc.*, 2019-0226-JTL (Del. Ch. Mar. 22, 2019); *Arthur J. Gallagher & Co. v. Kuntz and Alliant Ins. Servs., Inc.*, No. GD-19-02440 (Pa. C.P. Allegheny Cnty. Feb. 8, 2019); *NFP Corp. and Maschino, Hudelson & Associates, L.L.C. v. Ayala, Alliant Ins. Services, Inc. and C.L. Scott Corporate Ins. Services, Inc.*, 2018-0688 (Del. Ch. Sept. 18, 2018); *Corp. Synergies Grp., LLC v. Andrews, Ur, Duffy, and Alliant Ins. Servs., Inc.*, No. 18-cv-13381 (D.N.J. Aug. 30, 2018); *Marsh USA, Inc. v. Moody, Young, Beacham, O'Connell,*

*and Alliant Ins. Servs., Inc.*, No. 17-651325 (N.Y. Sup. Ct. Aug. 7, 2018); *Willis Ins. Servs. of Ga. v. Alliant Ins. Servs., Inc.*, No. 18-cv-1826 (M.D. Fla. July 25, 2018); *Willis Ins. Servs. of Ga. v. Alliant Ins. Servs., Inc.*, No. 2018cv308132 (Ga. Super. Ct. July 23, 2018); *Willis of Minn. v. Alliant Ins. Servs., Inc.*, No. 27-cv-18-11684 (Minn. Dist. Ct. July 20, 2018); *Arthur J. Gallagher & Co. v. Long and Alliant Ins. Servs., Inc.*, No. 17-cv-12313 (D. Mass. Dec. 13, 2017); *Wells Fargo Ins. Servs. USA and USI Ins. Servs. LLC v. Blazer*, No. 17-cv-9520 (S.D.N.Y. Dec. 5, 2017); *USI Ins. Servs., LLC. v. Zukus and Alliant Ins. Servs., Inc.*, No. 2018-12953 (Pa. C.P. Montgomery Cnty. May 15, 2018); *Arthur J. Gallagher & Co. v. Long and Alliant Ins. Servs., Inc.*, No. 17-cv-12313 (D. Mass. Dec. 13, 2017); *USI Ins. Servs. Nat., Inc. Inc. v. Grassi and Alliant Ins. Servs., Inc.*, 2017-CA-009742-O (Fla. Cir. Ct. Nov. 3, 2017); *USI, Inc. v. Call v. Alliant Ins. Servs., Inc.*, No. BC678226 (Cal. Super. Ct. Oct. 2, 2017); *Cook Maran & Assocs., Inc. v. Scrocca and Alliant Ins. Servs., Inc.*, No. C-209-17 (N.J. Super. Ct. 2017); *Wells Fargo Ins. Servs. USA, Inc. v. Alliant Ins. Servs., Inc.*, No. 2017-0540 (Del. Ch. July 26, 2017); *Ralph Weiner & Assocs., LLC v. Hancock*, No. 2017-CH-06618 (Ill. Cir. Ct. May 9, 2017); *Wells Fargo Ins. Servs. USA, Inc. v. Laman*, No. 502016CA00904MB (Fla. Cir. Ct. April 10, 2017); *The Graham Co. v. Harper, Algeo, Alliant Ins. Servs., Inc.*, No. 170202712 (Pa. C.P. Philadelphia Cnty. Feb. 9, 2017); *Willis of Mass. v. Feinberg and Alliant Ins. Servs.*, No. 1684CV01497 (Mass. Super. Ct. Oct. 3, 2016); *The Hays Group, Inc. v. Peters and Alliant Ins. Servs., Inc.*, No. 0:16-cv-2352 (D. Minn. Oct. 12, 2016); *Willis of Fla. v. Powell, Bolden, and Alliant Ins. Servs., Inc.*, No. 2016-CA-007824 (Fla. Cir. Ct. Aug. 16, 2016); *Marsh USA Inc. and Marsh & McLennan Cos., Inc. v. Schuhriemen*, No. 16-cv-2998 (S.D.N.Y. Apr. 22, 2016); *Aon PLC v. Heffernen and Alliant Ins. Servs., Inc.*, No. 16-cv-1924 (N.D. Ill. Feb. 2, 2016); *Smith Bros. Ins. LLC v. Ellenberg-Gray*, No. CV-15-6060903-S (Conn. Super. Ct. Dec. 7, 2015); *Aon Corp. v. Alliant Ins. Servs. Inc.*, No. 14-650700 (N.Y. Sup. Ct. June 26, 2014); *Regions*

*Ins., Inc. v. Alliant Ins. Servs., Inc.*, No. 13-cv-00667 (S.D. Miss. Oct. 25, 2013); *Anco Ins. Servs. of Hous. v. Barnard*, No. 2011-29054 (Tex. Dist. Ct. May 13, 2011); *Aon Risk Servs. v. Cusack and Alliant Ins. Servs., Inc.*, No. 651673/2011 (N.Y. Sup. Ct. 2011).

61.     Courts have enjoined Alliant's unlawful behavior or otherwise ruled against Alliant in at least the following matters: *Marsh & McLennan Agency, LLC v. Alliant Ins. Servs., Inc., Johnny Osborne, Margaux Stone, and Rachel Murray*, No. 24-cv-00914, Op. and Order Granting in Part and Denying in Part Appl. for Prelim. Inj., ECF. No. 31 (S.D.N.Y. Jan. 27, 2025); *Jones v. AssuredPartners NL, LLC*, No. 24-cv-398, TRO, ECF. No. 30 (W.D. Ky. July 12, 2024) (including counterclaims *AssuredPartners Cap., Inc. v. Alliant Ins. Servs., Inc., Adamic, and Brewer*); *Jones v. AssuredPartners NL, LLC*, No. 24-cv-398, Mem. and Op., ECF. No. 92 (W.D. Ky. Sept. 13, 2024) (including counterclaims *AssuredPartners Cap., Inc. v. Alliant Ins. Servs., Inc., Adamic, and Brewer*); *Jones v. AssuredPartners NL, LLC*, No. 24-cv-398, Consent Prelim. Inj. Order, ECF No. 93 (W.D. Ky. Sept. 13, 2024) (including counterclaims *AssuredPartners Cap., Inc. v. Alliant Ins. Servs., Inc., Adamic, and Brewer*); *USI Ins. Servs. LLC v. Louis Spina and Alliant Ins. Servs., Inc.*, No. 70777/2023, Order to Show Cause for TRO and Prelim. Inj., NYSCEF Doc. No. 36 (N.Y. Sup. Ct. Nov. 21, 2023); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc.*, No. 23-cv-659, TRO, ECF. No. 46 (E.D. Va. Nov. 8, 2023); *Assured Partners of S.C., LLC v. Alliant Ins. Servs., Inc., Lonneman, Shultz, Peterson, Bugeski, Rushe, and Harris*, No. 23-cv-04751, Order, ECF No. 47 (D.S.C. Nov. 8, 2023) (temporary restraining order); *Assured Partners of S.C., LLC v. Alliant Ins. Servs., Inc., Lonneman, Shultz, Peterson, Bugeski, Rushe, and Harris*, No. 23-cv-04751, Prelim. Inj. Order, ECF. No. 63 (D.S.C. Dec. 28, 2023); *Assured Partners of S.C., LLC v. Alliant Ins. Servs., Inc., Lonneman, Shultz, Peterson, Bugeski, Rushe, and Harris*, No. 23-cv-04751, Permanent Inj. Order, ECF No. 63 (D.S.C. May 24, 2024); *Willis Towers Watson*

*Southeast, Inc. v. Alliant Ins. Servs., Inc., Andrew Rader, and Nicole Rioux*, No. 202982-1, TRO

(Chan. Ct., Tenn., Aug. 3, 2021); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc.,*

*Thomas, Bennett, and Gullet*, No. 22-cv-277, Prelim. Inj. Order, ECF No. 43 (W.D.N.C. July 7,

2022); *Kibble & Prentice Holding Co. v. Anderson and Alliant Ins. Servs., Inc.*, No. 82-CV-21-

619, Order Granting Pl.'s Mot. for Partial Summ. J. (Minn. Dist. Ct. Dec. 28, 2022); *Aitkin v. USI*

*Ins. Servs., LLC*, No 21-cv-00267, Op. & Order, ECF. No. 19 (D. Or. Feb. 26, 2021) (granting

temporary restraining order); *Aitkin v. USI Ins. Servs., LLC*, No 21-cv-00267, Op. & Order, ECF.

No. 19 (D. Or. May 28, 2021) (granting preliminary injunction); *Kibble & Prentice Holding Co.,v.*

*Tilleman and Alliant Ins. Servs., Inc*., No. 21-cv-00083, Mem. Dec. & Order, ECF No. 82 (D.

Idaho December 2, 2022) (granting in part plaintiff's motion for summary judgment);

*AssuredPartners Northeast, LLC v. Stone and Alliant Ins. Servs., Inc.*, 20-cv-05564, Order, ECF No.

30 (E.D.N.Y Nov. 24, 2020) (temporary restraining order); *AssuredPartners Northeast, LLC v.*

*Stone*, 20-cv-05564, Agreed Permanent Injunction and Order of Dismissal, ECF No. 35 (E.D.N.Y

December 21, 2020); *Huntington Bancshares Inc. v. Burke and Alliant Ins. Servs., Inc.*, 20-cv-01159,

Order, ECF No. 15 (W.D. Pa. Aug. 10, 2020) (temporary restraining order); *Huntington Bancshares*

*Inc. v. Burke and Alliant Ins. Servs., Inc.*, 20-cv-01159, Mem. Op., ECF No 60 (W.D. Pa. Oct. 29,

2020) (granting preliminary injunction); *Huntington Bancshares Inc. v. Burke and Alliant Ins. Servs.,*

*Inc.*, 20-cv-01159, Order, ECF No 61 (W.D. Pa. Oct. 29, 2020) (preliminary injunction); *Assured*

*Partners of Wash., LLC v. Acarregui, and Alliant Ins. Servs., Inc.*, No. 20-cv-00290, Temporary

Restraining Order, ECF No. 15 (W.D. Wash. Feb. 28, 2020); *Aon Risk Servs. Co. v. Alliant Ins.*

*Servs., Inc. Brusek, Janic Lubas, Ross, Taylor, Vick, and Walsh*, No. 19-cv-07312, Temporary

Restraining Order, ECF No. 31 (N.D. Ill. Nov. 25, 2019); *Aon Risk Servs. Co. v. Alliant Ins. Servs.,*

*Inc., Brusek, Janic Lubas, Ross, Taylor, Vick, and Walsh*, No. 19-cv-07312, Mem. Op. & Order,

ECF No. 32 (N.D. Ill. Nov. 25, 2019); *Mt. W. Series of Lockton Cos., LLC and Lockton Partners, LLC v. Alliant Ins. Servs., Inc.*, No. CV 2019-0226-JTL, 2019 WL 2536104 (Del. Ch. June 20, 2019); *Corp. Synergies Grp., LLC v. Andrews, Ur, Duffy, and Alliant Ins. Servs., Inc.*, No. 18-cv-13381, Order, ECF No. 14 (D.N.J. Sept. 5, 2018) (temporary restraining order); *Corp. Synergies Grp., LLC v. Andrews, Ur, Duffy, and Alliant Ins. Servs., Inc.*, No. 18-cv-13381, Order, ECF No. 14 (D.N.J. Oct. 3, 2018) (preliminary injunction); *Wells Fargo Ins. Servs. USA and USI Ins. Servs. LLC v. Blazer*, No. 17-cv-9520, Order, ECF No. 11 (S.D.N.Y. December 7, 2017) (temporary restraining order); *Wells Fargo Ins. Servs. USA and USI Ins. Servs. LLC v. Blazer*, No. 17-cv-9520, Order to Show Cause for Temporary Restraining Order and Preliminary Injunction, ECF No. 12 (S.D.N.Y. December 7, 2017); *Wells Fargo Ins. Servs. USA and USI Ins. Servs. LLC v. Blazer*, No. 17-cv-9520, Order Granting a Permanent Injunction, ECF No. 32 (S.D.N.Y. February 13, 2018); *USI Ins. Servs. Nat., Inc. Inc. v. Grassi and Alliant Ins. Servs., Inc.*, 2017-CA-009742-O, Order Granting Temporary Injunction (Fla. Cir. Ct. Nov. 28, 2017); *USI Ins. Servs. Nat., Inc. Inc. v. Grassi and Alliant Ins. Servs., Inc.*, 2017-CA-009742-O, Order on Plaintiff's Motion for Summary Judgment on Liability (Fla. Cir. Ct. Aug. 22, 2019); *Cook Maran & Assocs., Inc. v. Scrocca and Alliant Ins. Servs., Inc.*, No. C-209-17 (N.J. Super. Ct., Sept. 12, 2017); *Willis of Fla. v. Powell, Bolden, and Alliant Ins. Servs., Inc.*, No. 2016-CA-007824, Order Partially Granting Motion for Injunction, 2016 WL 8814184 (Fla. Cir. Ct. Aug. 21, 2016); *Marsh USA Inc. and Marsh & McLennan Cos., Inc. v. Robert Schuhriemen*, No. 16-cv-2998, Mem. Order, ECF. No 11 (S.D.N.Y. May 2, 2016) (granting preliminary injunction); *Aon PLC v. Heffernen and Alliant Ins. Servs., Inc.*, No. 16-cv-1924, Order, ECF No. 26 (N.D. Ill. Feb. 5, 2016) (temporary restraining order); *Aon Corp. v. Alliant Ins. Servs. Inc.*, No. 650700/2014, 2014 WL 2990393 (N.Y. Sup. Ct. June 26, 2014) (preliminary injunction); *Anco Ins. Servs. of Hous. v. Barnard*, No. 2011-29054 (Tex.

Dist. Ct. May 13, 2011); *Aon Risk Servs. v. Cusack and Alliant Ins. Servs., Inc.*, No. 651673/2011 (N.Y. Sup. Ct. Sept. 28, 2011) (temporary restraining order); *Aon Risk Servs. v. Cusack and Alliant Ins. Servs., Inc.*, No. 651673/2011, 34 Misc. 3d 1205(A) (N.Y. Sup. Ct. Dec. 20, 2011) (preliminary injunction).

62.     Alliant's unlawful conduct remains ongoing and is likely to persist despite numerous lawsuits, injunctions, and even sanctions orders. This is because Alliant has determined that the financial gains it derives from its illegal practices are greater than it could achieve through lawful competition and outweigh the costs of defending and settling the resulting lawsuits.

###     E.    Alliant Recruits Pelletiere, and With His Help, Executes the Playbook on Marsh

63.     As alleged above, Alliant entered the Surety business not by building, but by by a calculated corporate raid so egregious that it was condemned by the New York Supreme Court.

64.     Since its initial theft of a Surety practice in 2011, Alliant's Surety business had remained focused on Construction Surety. But in 2024, Alliant decided to expand its Surety offerings, announcing in late 2024 that it was launching a new Commercial Surety practice.

65.     Once again, Alliant had no meaningful presence in the space. And once again, rather than building practice from the ground up—by investing in talent, infrastructure, and client development—Alliant chose to take one from a competitor. For this, it targeted the market leader: Marsh.

66.     But Alliant could not hijack Marsh's Commercial Surety business from the outside. It needed help on the inside—someone with access, trust, and control over the client relationships it wanted to take.

67.     Pelletiere was the perfect candidate. He brought exactly what Alliant wanted: a multimillion-dollar book of Commercial Surety business—built at Marsh's expense—anchored by

four marquee clients. He was the producer who had won those clients for Marsh and had served as their trusted advisor for nearly a decade, guiding them through complex bonding needs and earning their loyalty. The relationships he had formed on Marsh's behalf and at its expense were strong, long-standing, and defensively positioned—making him invaluable to Alliant.

68.    Alliant knew just how tight Pelletiere's grip on those client relationships was—because at the same time it was hiring him, it also brought on Tom Rhatigan, a former Marsh employee who had already tried and failed to take those clients. Rhatigan had worked under Pelletiere at Marsh and helped service his Commercial Surety accounts. In 2023, after leaving for a competing firm, Rhatigan attempted to lure the marquee clients in Pelletiere's book of business away from Marsh. He failed. Despite his familiarity with the accounts and his role in servicing them, he could not dislodge the business from Marsh.

69.    That failed raid sent a clear message: Marsh's Commercial Surety clients could not be moved without Pelletiere. No one understood that better than Rhatigan. When Alliant began plotting its own raid of those very same clients in 2024, Rhatigan—now on Alliant's payroll—was perfectly positioned to share the lesson from his own failed attempt: if Alliant wanted to flip the business, its only hope was to do so through the producer who held it.

70.    Pelletiere also brought more than just client access to Alliant. As head of Marsh's Northeast Surety practice, he had strategic oversight of Marsh's Surety operations across the region and intimate knowledge of its business plans, competitive posture, and go-to-market strategy. As the direct manager of the Surety employees in Marsh's largest region, Pelletiere occupied a position of authority that gave him unique leverage to identify, influence, and extract the team Alliant needed to replicate Marsh's service model. In short, Pelletiere brought Alliant the entire package: the book, the blueprint, and the team to execute it. He was the perfect inside man.

71.    Alliant knew full well that Pelletiere was bound by contracts with Marsh containing restrictive covenants prohibiting him from soliciting Marsh clients and employees or servicing Marsh accounts after his departure—and that those contracts were governed by New York law and contained mandatory forum selection clauses. It also understood the fiduciary duties he owed Marsh as the Northeast Surety Zone Leader. But that was the point. Alliant recruited him precisely to break those obligations—to exploit his insider knowledge and relationships to transfer Marsh's book of business, intact, to Alliant.

72.    Inducing Pelletiere to breach his contractual and fiduciary duties was not cheap— Alliant had to pay big. Alliant offered him double his current base salary, guaranteed him a bonus 60% higher than the bonus he earned at Marsh, and awarded him equity. To be clear, these terms were not payment for future performance—they were an advance on stolen business. The offer was expressly conditioned on Pelletiere's ability to deliver Marsh clients, and included earn-outs tied to exactly how much of Marsh's business he could take.

73.    And Alliant did not just invest in Pelletiere. With Pelletiere's guidance, Alliant launched a coordinated talent raid on Marsh's Surety team, targeting the individuals best positioned to help move the book of business he oversaw for Marsh and recreate Marsh's Commercial Surety capabilities from the inside out. Drawing on confidential compensation data, reporting structures, and performance reviews—all information Pelletiere accessed through his leadership role—he advised Alliant on whom to pursue, how to approach them, and what to offer. On information and belief, he shared precise compensation details to help Alliant craft offers tailored to overcome resistance and ensure key personnel would follow him out the door.

74.    Alliant's objective was twofold: strip Marsh of its ability to service existing Commercial Surety clients and simultaneously seed Alliant with institutional knowledge of

Marsh's Commercial Surety operations. Pelletiere tailored the recruitment effort to maximize both goals. He prioritized employees with direct knowledge of and relationships with the Marsh clients in his book of business and broad visibility into Marsh's regional Surety operations. In doing so, he leveraged proprietary knowledge entrusted to him in confidence—weaponizing it to aid Marsh's direct competitor.

75.     The team handpicked for Alliant by Pelletiere was no accident. Chief among those targets were Horgan, Diaz, and Manning—the three professionals who directly supported Pelletiere's book of business. Each had developed longstanding relationships with the clients and possessed the kind of institutional know-how needed to make the transition appear frictionless. With the entire team on board, Pelletiere and Alliant could present clients with a compelling pitch: stay with Marsh and risk being reassigned to an unfamiliar service team—one that might not understand your business, your preferences, or your needs—or move to Alliant and keep the same trusted professionals—the same team and the same service, uninterrupted.

76.     To make that pitch a reality, Alliant did not just offer generous salaries—it shelled out compensation so outsized it bore no relation to market norms. These were service staff, not rainmakers. But the offers were structured to leave no room for hesitation. The team was too important to risk losing: the team members were the connective tissue between Pelletiere and the Marsh clients he and Alliant wanted to take, and the team's presence would make the transition seamless. The goal was not just to entice—it was to guarantee they would come.

### H.     Alliant and Pelletiere Execute on their Scheme

77.     Pelletiere had already solicited and secured commitments from Horgan (and, on information and belief, Diaz and Manning as well) by late January 2025—while still employed at

Marsh and before giving any notice of his intent to leave. The offers were in place. The team was assembled. All that remained was the execution.

78.     Knowing that dislodging Marsh's long-term clients would be no easy feat—even with Pelletiere's help—Alliant and Pelletiere timed the execution with surgical precision, with one goal in mind: to manufacture the appearance of instability at Marsh just as clients were being forced to reassess their loyalties. Alliant's and Pelletiere's strategy—staggered resignations, immediate departures, and coordinated timing—was calculated to create the appearance of internal disruption in Marsh's Commercial Surety operations in the eyes of the clients, giving Pelletiere a critical advantage as he actively solicited the clients on Alliant's behalf. The pitch was simple: Marsh was unraveling—better to move now, with the team you know.

79.     On January 24, 2025, at approximately 1:00 p.m., Pelletiere called Brian Hodges— Marsh's U.S. Surety Leader and his direct supervisor— to announce his immediate resignation to join Alliant. He then called Robert McDonough, Marsh's U.S. Construction Practice Leader and his indirect supervisor, and gave the same news. Pelletiere described Alliant's offer as "too good to pass up": a three-year guaranteed deal that doubled his Marsh base salary, boosted his bonus by 60%, and included equity. But he also assured McDonough that he understood his post-employment obligations and would not take any Marsh clients or employees.

80.     That fiction did not even survive the hour. At 1:33 p.m.—just minutes after Pelletiere claimed he was not taking anyone with him—Horgan, his top lieutenant, emailed Hodges and McDonough: "Gentlemen, Please allow this email to serve as notice of my resignation effective immediately." The timing was not a coincidence. Pelletiere had already lined up Horgan to follow him out the door.

81.     Moments after sending his resignation email, Horgan called McDonough to confirm the obvious: he was joining Alliant alongside Pelletiere. McDonough asked why—especially since Marsh had just recently informed Horgan that his long-anticipated promotion would take effect in April. Horgan said his decision was final and that the financial offer from Alliant was simply too rich to walk away from: it included a raise that would increase his current salary by well over half, a guaranteed bonus almost equal to his entire annual salary, and a signing bonus.  McDonough asked for time to prepare a counteroffer to try to retain him.

82.     Approximately one hour later, McDonough called Horgan back and offered a significant compensation increase. Horgan declined, explaining that Alliant had already sweetened its own offer—raising his base salary by nearly $50,000, now more than 80% above his Marsh salary. Horgan then dropped a cryptic hint: "something bigger is coming." When McDonough pressed for clarification, Horgan responded: "more people."

83.     Alliant's offer to Horgan reflects the critical role he would play in building Alliant's new Commercial Surety practice from scratch. At Marsh, Horgan oversaw forecasting, revenue tracking, and operational planning for the Surety practice. He sat on Marsh's Global Construction Executive Committee and had unfettered access to confidential client and financial data—including Marsh's U.S. business plan, account-level profitability metrics, rate structures, and forward-looking strategies. On information and belief, Alliant now has this information and is putting it to use to Marsh's detriment.

I.      **At Alliant, Pelletiere and Horgan Begin Their Client Solicitation Campaign**

84.     Pelletiere and Horgan began working at Alliant the moment they walked out of Marsh—and wasted no time launching the client-solicitation campaign they had spent months orchestrating. They did so at Alliant's direction and with its full support and encouragement.

Indeed, Alliant had recruited them for that very purpose: to transfer the Marsh Surety book they had managed to Alliant, particularly the marquee clients that were the largest most lucrative in the book. Alliant knew that Horgan, like Pelletiere, was bound by a contract with Marsh containing restrictive covenants prohibiting solicitation, and that his contract contained a mandatory forum selection clause designating New York. But Alliant induced and facilitated his and Pelletiere's breaches anyway because the goal was not just to hire employees, but to capture Marsh's clients.

85.     Within days of their departure, the campaign surfaced. One of Pelletiere's marquee clients reported to Marsh that Horgan had already reached out—actively soliciting the client to move its business to Alliant.

86.     Marsh responded immediately, mobilizing to protect its client relationships from this coordinated assault, in deliberate breach of Pelletiere's and Horgan's contractual obligations

87.     Marsh reassigned Horgan's accounts to Manning, who promptly contacted the affected clients, introduced himself, and reassured them that Marsh remained steady and well-positioned to serve their needs—despite Pelletiere's and Horgan's departures.

88.     Marsh believed it was containing the damage. But in fact, Marsh had walked straight into Alliant's trap. Reassigning the accounts to Manning was exactly what Alliant—and Pelletiere—wanted. Unbeknownst to Marsh, Pelletiere had secretly solicited Manning *before* resigning and had lined him up to defect. The plan was to stagger the resignations: let Marsh settle the client relationships with Manning as the new steady hand—then pull him out to maximize disruption.

89.     On February 10, 2025—two weeks after Pelletiere and Horgan resigned—Manning submitted his resignation, effective immediately. McDonough called Manning in an effort to retain him. But Manning confirmed that he was joining Alliant. Manning said he had spoken with

Pelletiere and could not pass up the opportunity to work and train under him. Thus, Pelletiere had solicited Manning too—another direct violation of his employee non-solicitation covenant.

90.    That same day—February 10—Madison Diaz also resigned to join Alliant. Diaz had been the primary administrative support for two of Pelletiere's marquee clients—two clients Alliant was aggressively targeting.

91.    Manning and Diaz resigned on the exact same day—despite working in different cities, reporting to different offices, and holding very different roles. Their exits were plainly choreographed by Alliant. And why that day? Marsh had just reassigned Horgan's accounts to Manning, introduced him to the clients, and positioned him as a steady hand and the face of continuity. Then, precisely when Marsh needed to project stability the most, Manning walked out. This was not organic attrition. It was a calculated play by Alliant to manufacture the appearance of instability and turbulence in the eyes of clients—at the very moment it was pressing to flip those same accounts.

92.    On March 28, 2025—two months after Pelletiere joined Alliant—the results of his and Alliant's client solicitation campaign materialized. That day, one of the largest and longest-standing Marsh clients within Pelletiere's book of business abruptly issued a Broker of Record letter, appointing Alliant as its exclusive broker for its surety bond program.

93.    This was not a routine client departure. The client had been with Marsh for nearly a decade, with Pelletiere serving as its relationship lead throughout. Diaz managed the day-to-day administration of the account. It was one of the largest clients in Pelletiere's book. And it had previously demonstrated its commitment to Marsh: less than two years earlier, Rhatigan had tried and failed to poach it. The client chose to remain with Marsh. But with Pelletiere at Alliant, that changed.

94.     The timing of the client's departure underscores the nature of what occurred. Pelletiere resigned on January 24, 2025. Diaz followed on February 10. Yet the client did not move until March 28. That gap was not incidental—it reflects the time Alliant and Pelletiere spent working to dislodge a client that had maintained a nearly decade-long relationship with Marsh. This was not a spontaneous decision by a loyal client to follow a former trusted advisor. It was the result of targeted efforts by Pelletiere and Alliant to flip the account. Because Marsh had entrusted him with the relationship for years, Pelletiere was uniquely positioned with the access and credibility to make the ask. And he did, in violation of his contractual obligations. The client ultimately relented.

## <u>COUNT I</u>

**Breach of Contract
Breach of the Marsh USA Inc. Non-Solicitation Agreement
and the Restrictive Covenant Agreement –
Employee Non-Solicitation Covenant
(Against Pelletiere)**

95.     Marsh realleges and incorporates by reference herein the allegations set forth in the foregoing paragraphs as if fully set forth herein.

96.     Pelletiere voluntarily executed an NSA and RCA with Marsh in connection with his employment at Marsh.

97.     The NSA and RCA are valid and binding contracts between Pelletiere and Marsh.

98.     Marsh performed its obligations under the NSA and RCA with Pelletiere.

99.     The NSA and RCA prohibit Pelletiere from, within one year of his separation of employment from Marsh, "directly or indirectly" soliciting or attempting to solicit any Marsh employee: (a) with whom Pelletiere interacted in the last two years of his employment for the

purpose of soliciting or servicing business, or (b) about whom he obtained "Confidential Information and Trade Secrets." Ex. A, § 2; Ex. C § 3.

100.     Horgan, Manning and Diaz were all employees of Marsh with whom Pelletiere interacted in his last two years of Marsh for the purpose of soliciting or servicing business and about whom he obtained "Confidential Information and Trade Secrets."

101.     Pelletiere breached the NSA and the RCA by, within one year of his separation from Marsh, "directly or indirectly," "solicit[ing] or endeavor[ing] to cause" Horgan, Manning, and Diaz "to leave employment with [Marsh]."

102.     As a direct and proximate result of Pelletiere's breaches of the NSA and RCA, Marsh is entitled to the express remedies provided for in the parties' agreements, in addition to all available legal and equitable remedies.

103.     As a direct and proximate result of Pelletiere's breaches of the NSA and RCA, Marsh has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. Marsh will continue to suffer further harm unless and until Pelletiere is restrained from his current conduct and compelled to abide by the terms of the NSA and RCA.

104.     As a direct and proximate result of Pelletiere's breaches of the NSA and RCA, Marsh has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, lost profits, and damages to its goodwill, in an amount to be proven at trial.

**COUNT II**

**Breach of Contract
Breach of the Marsh USA Inc. Non-Solicitation Agreement
and the Restrictive Covenant Agreement –
Client Non-Solicitation Covenant
(Against Pelletiere)**

105.    Marsh realleges and incorporates by reference herein the allegations set forth in the foregoing paragraphs as if fully set forth herein.

106.    Pelletiere voluntarily executed an NSA and RCA with Marsh in connection with his employment at Marsh.

107.    The NSA and RCA are valid and binding contracts between Pelletiere and Marsh.

108.    Marsh performed its obligations under the NSA and RCA with Pelletiere.

109.    The NSA and the RCA prohibit Pelletiere, for one-year following his separation of employment from Marsh, from "directly or indirectly":

> (i)     Solicit[ing] clients or prospective clients of the Company for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by the Company;
>
> (ii)    induce clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company;
>
> (iii)   perform or supervise the provision or performance of services or provision of products of the type sold or provided by Employee while he or she was employed by the Company on behalf of any clients or prospective clients of the Company; or
>
> (iv)    assist others to do the acts specified in Sections 1(b) (i)-(iii).

Ex. A, § 1; Ex. C § 2.

110.    Pelletiere breached the NSA and RCA by directly or indirectly soliciting Marsh clients for the purpose of selling or providing or services of the type sold or provided by Pelletiere while employed at Marsh, inducing clients or prospective clients of Marsh to terminate, cancel, not renew or not place business with Marsh, and/or assisting others to do those acts.

111.    As a direct and proximate result of Pelletiere's breaches of the NSA and RCA, Marsh is entitled to the express remedies provided for in the parties' agreements, in addition to all available legal and equitable remedies.

112.    As a direct and proximate result of Pelletiere's breaches of the NSA and RCA, Marsh has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. Marsh will continue to suffer further harm unless and until Pelletiere is restrained from his current conduct and compelled to abide by the terms of the NSA and RCA.

113.    As a direct and proximate result of Pelletiere's breaches of the NSA and RCA, Marsh has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, lost profits, and damages to its goodwill, in an amount to be proven at trial.

## COUNT III

**Breach of Contract**
**Breach of the Marsh USA Inc. Non-Solicitation Agreement –**
**Client Non-Solicitation Covenant**
**(Against Horgan)**

114.    Marsh realleges and incorporates by reference herein the allegations set forth in the foregoing paragraphs as if fully set forth herein.

115.    Horgan voluntarily executed an NSA with Marsh in connection with his employment at Marsh.

116.    The NSA is a valid and binding contract between Horgan and Marsh.

117.    Marsh performed its obligations under the NSA with Horgan.

118.    The NSA prohibits Horgan, for one-year following his separation of employment from Marsh, from "directly or indirectly":

> (i)     Solicit[ing] clients or prospective clients of the Company for the purpose of selling or providing products or services of the type sold or provided by Employee while employed by the Company;
>
> (ii)    Induc[ing] clients or prospective clients of the Company to terminate, cancel, not renew, or not place business with the Company;
>
> (iii)   Perform[ing] or supervis[ing] the provision or performance of services or provision of products of the type sold or provided by Employee while he or she was employed by the Company on behalf of any clients or prospective clients of the Company; or
>
> (iv)    assist[ing] others to do the acts specified in Sections 1(b) (i)-(iii).

Ex. B, § 1.

119.    Horgan breached the NSA by directly or indirectly soliciting Marsh clients for the purpose of selling or providing or services of the type sold or provided by Horgan while employed

at Marsh, inducing clients or prospective clients of Marsh to terminate, cancel, not renew or not place business with Marsh, and/or assisting others to do those acts.

120.    As a direct and proximate result of Horgan's breaches of the NSA, Marsh is entitled to the express remedies provided for in the parties' agreements, in addition to all available legal and equitable remedies.

121.    As a direct and proximate result of Horgan's breaches of the NSA, Marsh has suffered and will continue to suffer extensive, irreparable injury, loss of goodwill, harm to its business, and other injury and damages for which there is no adequate remedy at law. Marsh will continue to suffer further harm unless and until Horgan is restrained from his current conduct and compelled to abide by the terms of the NSA and RCA.

122.    As a direct and proximate result of Horgan's breaches of the NSA and RCA, Marsh has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, lost profits, and damages to its goodwill, in an amount to be proven at trial.

## COUNT IV

### Breach of Fiduciary Duty
### (Against Pelletiere)

123.    Marsh realleges and incorporates by reference herein the allegations set forth in the foregoing paragraphs as if fully set forth herein.

124.    By virtue of Pelletiere's position at Marsh, the special relationship of trust and confidence reposed by Marsh in him, and the permission afforded him by Marsh to its confidential, proprietary and trade secret information, Pelletiere was required to act solely in Marsh's interest. Pelletiere also had duties of loyalty and utmost good faith to Marsh and was obligated not to

subvert or misappropriate Marsh's confidential and trade secret information or business opportunities.

125.    Pelletiere breached his duties of loyalty owed to Marsh by, among other things, while still employed by Marsh, soliciting Marsh employees to leave their employment with Marsh and join Alliant.

126.    As a direct and proximate result of Pelletiere's breaches of his duties of loyalty, Marsh has suffered extensive injury, loss of goodwill, harm to its business, and other damages.

127.    As a direct and proximate result of Pelletiere's breaches of his fiduciary duties, marsh already has suffered and will continue to suffer additional damages in an amount that is presently unascertainable, including but not limited to attorneys' fees and costs related to this litigation, as well as lost business, in an amount to be proven at trial.

128.    Pelletiere committed these acts knowingly, willfully and in conscious disregard of Marsh's rights. Accordingly, Marsh is entitled to recover actual and exemplary damages in an amount to be proven at trial.

## COUNT V

### Aiding and Abetting Breach of Fiduciary Duty
### (Against Alliant)

129.    Marsh realleges and incorporates by reference herein the allegations set forth in the foregoing paragraphs as if fully set forth herein.

130.    Pelletiere owed a fiduciary duty of loyalty to Marsh during his employment with Marsh.

131.    Pelletiere's fiduciary duty of loyalty prohibited him from, among other things, competing with Marsh by soliciting Marsh employees on behalf of a competitor.

132.    Pelletiere violated his fiduciary duty of loyalty by soliciting Marsh's employees

away from Marsh to join Alliant while Pelletiere was still employed by Marsh.

133.    Alliant knowingly participated in Pelletiere's breaches of his duty of loyalty by encouraging and substantially assisting Pelletiere's breaches of his duty of loyalty.

134.    As a direct and proximate result of Alliant's wrongful conduct, Marsh has suffered and will continue to suffer extensive injury and harm to its business.

135.    As a direct and proximate result of Alliant's wrongful conduct, Marsh already has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proved at trial.

**COUNT VI**

**Tortious Interference with Contract**
**(Against Alliant and Pelletiere)**

136.    Marsh realleges and incorporates by reference herein the allegations set forth in the foregoing paragraphs as if fully set forth herein.

137.    Alliant was aware of the employment relationship between Pelletiere and Marsh, and his contractual obligations to Marsh to refrain from soliciting Marsh clients and employees for one year after the termination of his employment.

138.    Alliant, improperly and without privilege, interfered in Marsh's contracts with Pelletiere by inducing, enticing and directing him to breach his contractual obligations to Marsh, including, without limitation, by encouraging and assisting him in the solicitation of Marsh's clients to move their business to Alliant and the solicitation of Marsh employees to leave their employment at Marsh and join Alliant.

139.    As alleged above, Pelletiere, at Alliant's inducement and direction, violated the NSA and RCA by, without limitation, violating his client non-solicitation covenants by soliciting

Marsh clients to move their business from Marsh to Alliant. Alliant was aware of Pelletiere's contractual obligations but directed him to violate them for Alliant's benefit.

140.    As alleged above, Pelletiere, at Alliant's inducement and direction, violated the NSA and RCA by, without limitation, violating his employee non-solicitation covenants by soliciting Marsh employees to leave their employment at Marsh and join Alliant. Alliant was aware of Pelletiere's contractual obligations but directed him to violate them for Alliant's benefit.

141.    Alliant and Pelletiere were also aware of the employment relationship between Horgan and Marsh, and his contractual obligations to Marsh to refrain from soliciting Marsh clients and employees for one year after the termination of his employment.

142.    Alliant and Pelletiere, improperly and without privilege, interfered in Marsh's contracts with Horgan by inducing, enticing and directing him to breach his contractual obligations to Marsh, including, without limitation, by encouraging and assisting him in the solicitation of Marsh's clients to move their business to Alliant.

143.    As alleged above, Horgan, at Alliant's and Pelletiere's inducement and direction, violated the NSA by, without limitation, violating his client non-solicitation covenants by soliciting Marsh clients to move their business from Marsh to Alliant. Alliant and Pelletiere were aware of Horgan's contractual obligations but directed him to violate them for their benefit.

144.    The foregoing conduct was willful and intentional and has already caused and will continue to cause damage to Marsh with respect to its relationships with its clients.

145.    As a direct and proximate result of Alliant's and Pelletiere's wrongful conduct, Marsh has suffered and will continue to suffer extensive injury and harm to its business.

146.    As a direct and proximate result of Alliant's and Pelletiere's wrongful conduct, Marsh already has suffered and will continue to suffer additional damages in an amount that is not

presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

## COUNT VII

### Tortious Interference with Business Relations
### (Against Alliant and Pelletiere)

147.    Marsh realleges and incorporates by reference herein the allegations set forth in the foregoing paragraphs as if fully set forth herein.

148.    Marsh had ongoing relationships with its clients.

149.    As a producer at Marsh, Pelletiere had influential relationships with Marsh's clients, which were developed and strengthened over the years by virtue of his access to and knowledge of Marsh's confidential and trade secret information, which Pelletiere used to form successful relationships with Marsh's clients.

150.    Pelletiere and Alliant have knowledge about Marsh's relationships with its clients. Indeed, Pelletiere and Alliant had knowledge of Marsh's relationships with the clients for which Pelletiere was responsible at Marsh, which Pelletiere, at Alliant's direction and with its assistance and encouragement, improperly solicited away from Marsh.

151.    Despite this knowledge, Pelletiere and Alliant have intentionally and improperly interfered with the relationships between Marsh and its clients by soliciting Marsh's clients to cease their business with Marsh and move their business to Alliant.

152.    Pelletiere and Alliant engaged in wrongful conduct in doing so, by (among other things) Pelletiere breaching his contractual and fiduciary duties to Marsh, with Alliant's knowledge, assistance, and encouragement. Pelletiere and Alliant further accomplished their wrongful solicitation of the Marsh's clients for which Pelletiere had been responsible at Marsh by assuring the clients that Pelletiere and the same client service team that serviced the client at Marsh

would personally service their account at Alliant, despite Pelletiere's and Alliant's knowledge that those employees were prohibited from doing so per their contracts with Marsh.

153.    Pelletiere's and Alliant's conduct extends beyond the boundaries fair competition and has been tortious, in bad faith, dishonest, and designed to harm Marsh.

154.    Pelletiere and Alliant were aware that this conduct would disrupt Marsh's business relationships and intended this disruption to occur for the benefit of themselves.

155.    As a direct and proximate result of Pelletiere's and Alliant's conduct, Marsh has suffered and will continue to suffer additional damages in an amount that is not presently ascertainable, including but not limited to in the form of attorneys' fees and costs related to this litigation, and lost business, in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Marsh respectfully requests that the Court:

A.    Enter a preliminary and permanent order enjoining Pelletiere from committing other acts in violation of the RCA, and further extending the length of Pelletiere's restrictions under the RCA by a period equal to the length of time from the date of Pelletiere's first breach of the RCA until the date of this Court's order;

B.    Enter a preliminary and permanent order enjoining Pelletiere and Horgan from committing other acts in violation of their NSAs, and further extending the length of the restrictions under their NSAs by a period equal to the length of time from the date of Pelletiere's and Horgan's first breach of their respective NSAs until the date of this Court's order;

C.    Enter judgment awarding Marsh direct and consequential damages in an amount to be determined at trial, to compensate Marsh for the losses it suffered by reason of Pelletiere's breaches of fiduciary duty (and Alliant's aiding and abetting of those breaches), Pelletiere's and Horgan's breaches of their contractual obligations to Marsh (and Alliant's inducement of those breaches), Alliant's interference in Marsh's contractual relationships with Pelletiere, Alliant's and Pelletiere's interference in Marsh's contractual relationships with Horgan, and Alliant's and Pelletiere's wrongful interference with Marsh's business relations with clients;

D.    Enter judgment awarding Marsh any compensation amounts paid to Pelletiere during the period of his disloyalty;

E.  Enter judgment awarding Marsh liquidated damages for Pelletiere's and Horgan's breaches of the NSA, as expressly provided in the NSA;

F.  Enter judgment awarding Marsh punitive damages for Defendants' intentional misconduct and/or gross negligence;

G.  Enter judgment awarding Marsh its reasonable costs and attorneys' fees incurred by it in connection with the litigation, as expressly provided under the NSA; and

H.  Grant Marsh such other and further relief as the Court deems just and proper.


Dated: July 1, 2025
        New York, New York

                                    EPSTEIN, BECKER & GREEN, P.C.


                                    By:      /s/ David W. Garland
                                            DAVID W. GARLAND
                                            A.  MILLIE WARNER

                                    875 Third Avenue
                                    New York, New York 10022
                                    (212) 351-4500
                                    *Attorneys for Plaintiff*
                                    *Marsh USA LLC*